

**AB**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

---

CHARMING SHOPPES INC.,

                             Plaintiff,

             -against-

CRESCENDO PARTNERS II, L.P., CRESCENDO
INVESTMENTS II, LLC, CRESCENDO PARTNERS III,
L.P., CRESCENDO INVESTMENTS III, LLC, MYCA
PARTNERS, INC., MYCA MASTER FUND, LTD.,
ARNAUD AJDLER, ERIC ROSENFELD, and ROBERT
FRANKFURT,

                             Defendants.

**08 1156**

---

## COMPLAINT

       Plaintiff Charming Shoppes Inc. ("Charming Shoppes" or the "Company"), by its undersigned attorneys, alleges for its complaint against defendants Crescendo Partners II, L.P., Series Q, Crescendo Investments II, LLC, Crescendo Partners III, L.P., and Crescendo Investments III, LLC (collectively, the "Crescendo Defendants"); Myca Partners, Inc. and Myca Master Fund, Ltd. (collectively, the "Myca Defendants"); and Arnaud Ajdler, Eric Rosenfeld, and Robert Frankfurt (collectively, the "Individual Defendants," and together with the Crescendo Defendants and Myca Defendants, "Defendants"), upon knowledge as to its own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

       1.       Plaintiff brings this action for preliminary and permanent injunctive relief to prevent Defendants and their undisclosed associates from continuing to violate the federal securities laws in furtherance of an unlawful plan, conceived and orchestrated by Defendants, to

threaten to elect defendants Ajdler, Frankfurt and Michael Appel, to the Company's board of directors and to force the Company to sell certain key assets or borrow money and buy back defendants' shares in a stock buyback or in a greenmail transaction or, after their actions have caused a short term increase in the price of Charming Shoppes' stock, to allow Defendants to sell their shares at a profit in the open market.

2.      Defendants' scheme violates the federal securities laws, specifically Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission ("SEC") promulgated thereunder.  The purpose of Section 13(d) is to alert the marketplace to large or rapid aggregations of securities that are indicative of a potential shift in corporate control and to provide investors with the information they need to make informed decisions concerning the future of their investment. This is accomplished by requiring persons having beneficial ownership of more than five percent of the equity securities of any publicly traded company to file disclosures with the SEC on a Schedule 13D setting forth, among other things, their identity and background, any plans or intentions with respect to the issuer, whether the party has been enjoined or found to have violated federal or state securities laws, as well as any agreements, arrangements or understandings they have among themselves or with others concerning the issuer's securities. They are also required to make disclosures regarding any subsequent increases in their holdings.

3.      In order to prevent a group of investors from surreptitiously obtaining more than five percent of the equity of an issuer through multiple buyers, Section 13(d) and the rules thereunder require that any such group acting together disclose all group members, their aggregate holdings and the terms of any agreements or understanding among them with respect to the targeted company.  Defendants' failure to comply with these provisions has thwarted the purpose of Section 13(d) and deprived Charming Shoppes' public investors of these protections.

2

4.     As discussed in greater detail below, on January 8, 2008, the Crescendo Defendants filed a Schedule 13D (the "Initial 13D"), stating that the Crescendo Defendants had no present intention or plan that would result in a change to the Company's board of directors, disingenuously claiming that they "may" at some point in the future seek board representation. The Crescendo Defendants' true plan at that time, however, consisted of working in concert with the Myca Defendants (whose existence and involvement were as yet undisclosed), the Individual Defendants and possibly other undisclosed collaborators to abuse the proxy process to enrich themselves at the expense of Charming Shoppes and its unsuspecting shareholders.

5.     On January 15, 2008, only seven days after the Initial 13D filing, the Crescendo Defendants for the first time disclosed in an amended Schedule 13D (the "Amended 13D"), in part, their scheme of collaborating with the Myca Defendants and Individual Defendants.  As has been their practice and pattern with respect to other companies they have targeted, Defendants' scheme -- which still has not been accurately disclosed -- has always been to threaten a change to Charming Shoppes' board of directors in order to force Charming Shoppes to sell Company assets, or borrow money and then repurchase the Defendants' shares at a profit in either a stock buyback or a greenmail transaction, or through their threats and other actions, cause a short term increase in the price of Charming Shoppes stock so that Defendants and their collaborators can sell their shares at a profit in the open market.  Defendants' actions will irreparably harm Charming Shoppes and its shareholders.

6.     Moreover, Defendants' true intent is demonstrated by their agreement with a non-party, RCG Starboard Fund ("Starboard"), to split the trading gains obtained when Defendants and their collaborators eventually sell their Charming Shoppes stock.

7.     While Defendants in their Amended 13D disclosed part of their collaboration with the Myca Defendants, Defendants did not disclose and have never disclosed

3

that, upon information and belief, they have solicited numerous other hedge funds to join their scheme, and likely are acting as a "group" with other unnamed persons or entities who, in concert with them, have acquired Charming Shoppes shares as part of Defendants' scheme. Furthermore, by delaying the filing of their Schedule 13D and concealing the full membership of their group, Defendants surreptitiously accumulated at least eight percent of Charming Shoppes outstanding stock without making any disclosure to the investing public -- as required by Section 13(d) -- that they were colluding to seize control of Charming Shoppes for their own benefit.

8.      Defendants also failed to disclose, both in their Initial 13D filing and Amended 13D filing, their history of violating federal securities laws and abusing the proxy process for short-term financial gain.  They have depicted themselves to the investing public as legitimate investors and "would-be" directors, when in truth their intention is to achieve personal gain at the expense of Charming Shoppes and its shareholders.  At no time have Defendants disclosed any part of their true track record of using proxy fights to disrupt corporations and to, profit by forcing them to sell assets, buy back stock or buy off defendants and their cronies – as they plainly intend to do here.

9.      Nor have Defendants disclosed their history of routinely making false and misleading securities filings in order to conceal their self-interested motivation from the companies they target and those companies' public shareholders.

10.     Unless injunctive relief is ordered, Charming Shoppes and its shareholders will be irreparably harmed as a result of the securities laws violations described herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.  The claims in this

action arise under Section 13(d) of the Exchange Act, and Rule 13d-1 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.13d-1.

12. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts, transactions and conduct constituting violations of the Exchange Act, including the dissemination of false and misleading information, occurred, at least in part, in this District.

13. Acts and transactions constituting and in furtherance of the violations of the law have occurred, are occurring and, unless enjoined, will continue to occur, in this District. The actions cited have been carried out by the means and instrumentalities of interstate commerce and by the use of the United States mail.

## THE PARTIES

14. Plaintiff Charming Shoppes Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Bensalem, Pennsylvania. Charming Shoppes is a leading multi-brand, multi-channel specialty apparel retailer with a leading market share in women's plus-size specialty apparel. The Company's retail stores segment operates retail stores and related e-commerce websites through such distinct brands as Lane Bryant, Fashion Bug, Catherine's Plus Sizes, Lane Bryant Outlet and Petite Sophisticate Outlet. As of February 2008, the Company operated 2,378 stores in 48 states. Charming Shoppes' shares are registered pursuant to Section 12 of the Exchange Act and are publicly traded on the NASDAQ Global Select Market.

15. Crescendo Partners II, L.P., Series Q, is a Delaware limited partnership with its principal place of business in New York, New York.

16.     Crescendo Investments II, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

17.     Crescendo Partners III, L.P., is a Delaware limited partnership with its principal place of business in New York, New York.

18.     Crescendo Investments III, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

19.     Crescendo Investments II is the general partner of Crescendo Partners II. Crescendo Investments III is the general partner of Crescendo Partners III.   The managing member of each of Crescendo Investments II and Crescendo Investments III is Eric Rosenfeld.

20.     According to the Initial 13D filing, "the principal business of Crescendo Partners II is investing in securities.  The principal business of Crescendo Investments II is acting as the general partner of Crescendo Partners II.  The principal business of Crescendo Partners III is investing in securities.  The principal business of Crescendo Investments III is acting as the general partner of Crescendo Partners III.  The principal occupation of Mr. Rosenfeld is serving as the managing member of Crescendo Investments II, Crescendo Investments III and as the managing member of the general partner of Crescendo Partners, L.P., whose principal business is investing in securities."

21.     The Crescendo Defendants collectively operate a New York-based investment firm formed in 1998.

22.     Defendant Eric Rosenfeld is the managing member of Crescendo Investments II, Crescendo Investments III and the managing member of the general partner of Crescendo Partners, L.P.

23.    Defendant Myca Master Fund, Ltd., is a Cayman Islands company, with its principal place of business in New York, New York.  Myca Master Fund, Ltd's principal business is "investment advisory services."

24.    Defendant Myca Partners Inc. is a Delaware corporation with its principal place of business in New York, New York.  Myca Partners Inc.'s principal business involves rendering "investment advisory services and serving as the investment manager of Myca Master Fund."

25.    The Myca Defendants collectively operate an advisory services firm located in New York, New York.

26.    Defendant Arnaud Ajdler has been a Managing Director of Crescendo Partners II, L.P., since December 2005.

27.    Defendant Robert Frankfurt has served as President of Myca Partners since September 2006.

## **FACTUAL BACKGROUND**

28.    As discussed in paragraphs 34-52 below, beginning in or around December 2007, the Defendants steadily increased their stake in Charming Shoppes with a goal of launching a proxy fight ostensibly to obtain representation on the Company's board of directors.  In truth, Defendants are seeking to use the threat of a disruptive proxy fight to force a sale of certain Company assets, and coerce the Company to buy their shares through a stock buy back program or a greenmail transaction.  Defendants did not disclose these efforts in the Initial 13D filing, nor have they disclosed the true extent of their scheme in the Amended 13D filing.

**Defendants' Undisclosed History As Corporate Raiders**

29.     Over the past several years, Defendants have targeted vulnerable companies (often smaller capitalization companies that have suffered recent stock price declines), accumulating significant equity stakes, and threatening to conduct hostile proxy contests in order to elect their designees to the companies' boards of directors, with the intention from the outset of being disruptive to management for purposes of forcing a sale of the company, a stock buy back, extraordinary dividend or the greenmail repurchase of their shares.

**Myca Defendants' and Defendant Frankfurt's History As Corporate Raiders**

30.     Defendant Frankfurt and his company Myca Partners are notorious "activist investors" with a sordid history of misusing the proxy process to profit at the expense of targeted companies and their shareholders.   In this regard, prior to joining Myca Partners, Defendant Frankfurt was a partner at Steel Partners, a New York-based hedge fund.   During his tenure at Steel Partners, Frankfurt and Steel Partners launched numerous proxy fights in order to coerce target companies into selling the company, buying their stock at a premium (often through greenmail) or leveraging the company or selling assets to pay Steel Partners and its collaborators with share buy-backs or extraordinary dividends.   In each instance, Frankfurt and Steel Partners filed a false and misleading Schedule 13D that masked, rather than disclosed, their true intention of launching a proxy fight to either take control of the company or to force a greenmail repurchase:

(a)     Puroflow Inc. – On August 5, 1998, Frankfurt and Steel filed a Schedule 13D in which Steel stated that it had amassed an 11.9 percent holding in Puroflow for "investment purposes" only and had no plans to seek representation on Puroflow's Board, the sale of Puroflow or its assets or any other extraordinary transaction.   Steel then began amassing a much larger stake (more than 15 percent of Puroflow) and prior to Puroflow's next annual

meeting formed the "Puroflow Full Value Committee," and launched a proxy fight to seize control of Puroflow's Board and force a sale of the Company. After months of costly litigation, Steel forced Puroflow to place its nominees on the Board and forced the ultimate sale of the Company.

(b)     Aydin Corp. – On August 10, 1998, Steel filed a Schedule 13D for Aydin Corporation, claiming that it believed Aydin to be "an attractive investment" and disclaiming any plan to seek seats on the Board or seek the sale of Aydin or its assets. One month later Frankfurt and Steel formed the "Aydin Full Value Committee," and disclosed for the first time that they had concluded that Aydin should sell itself and that they were launching a proxy fight to seize control of the Board and force a sale of the Company. Rather than fight a costly proxy fight, Aydin agreed to place two representatives of Steel's group on its Board and within six months agreed to sell itself to L-3 Communications, permitting Frankfurt and his collaborators to sell their shares at a hefty profit.

(c)     Bell Industries – On December 22, 1998, Steel filed a Schedule 13D stating that it had acquired 5.95 percent of the common stock of Bell Industries. Once again, its Schedule 13D claimed that its purchases were for investment purposes only and that it had no plans to seek seats on the Board or the sale of the Company or its assets. Three weeks later, after increasing its stake to over 10 percent, Steel and Frankfurt announced their plan to launch a proxy fight to place Frankfurt and three of his cronies on Bell's Board, giving them control of the Board. Steel waged a nearly year-long fight to obtain representation on Bell's Board purportedly to "give [  ] all the Company's shareholders an opportunity to receive maximum value for their shares." Then, on December 23, 1999, Steel and Frankfurt cashed in, selling the bulk of their holding within a week and walking away from Bell and its public shareholders.

31.     Moreover, in 1996, in connection with its solicitation of proxies for Medical Imaging Centers of America, Inc., Steel Partners was preliminary enjoined by the United States District Court for the Southern District of California from voting certain shares of its stock in a proxy contest.  The court there found a "high probability" that the plaintiff would succeed in establishing that Steel Partners and other members of its undisclosed group had violated Section 13(d) of the Exchange Act by failing to disclose, among other things, the existence of undisclosed collaborators in its effort to take control of the company.

**Crescendo Defendants' History As A Corporate Raider**

32.     Crescendo too has a sordid history of greenmailing and corporate raiding. Indeed, Eric Rosenfeld, the President and CEO of Crescendo Partners, a self-proclaimed "barbarian," has a well-deserved reputation for preying on small and struggling companies, launching proxy contests to force his way onto boards, and forcing companies to sell assets or borrow money and engage in share buybacks, extraordinary dividends or other transactions (including greenmail buyouts) that allow him and his collaborators to obtain short term gains at the expense of the target companies and their public shareholders.

33.     The Crescendo Defendants' modus operandi, like that of Defendant Frankfurt, is to surreptitiously accumulate a significant stock position before making disclosures under Section 13(d) – often in collaboration with unnamed partners.  Even though its initial 13D filing invariably disclaims any intention to seek control of its target company, Crescendo eventually (after amassing additional shares) threatens to conduct hostile proxy contests to elect its designees to the company's board of directors with the intention of either forcing a sale of the company, dismantling the company and selling off the pieces, forcing the greenmail repurchase of its shares at a profit or inflating on a short term basis the price of the stock so that it can profit by selling their shares in the marketplace.

10

(a)     <u>Computer Horizons Corporation</u> – In 2005 and 2006, Crescendo waged a campaign to seize control of the Board of Directors of Computer Horizons Corporation.  On July 22, 2005, Crescendo filed a Schedule 13D on behalf of the "Computer Horizons Full Value Committee," stating that it had no "present plan or proposal which would relate to, among other things, any sale of Computer Horizons or a material amount of its assets."  Five days later, Crescendo filed an amended Schedule 13D seeking to remove Computer Horizons' directors and replace them with Crescendo's nominees.  After a bitter four month proxy fight, Crescendo and the other members of its "Full Value Committee" obtained control of Computer Horizons' Board and promptly awarded themselves tens of thousands of stock options and generous cash retainers.  Crescendo and its cronies then broke Computer Horizons up, sold the pieces and liquidated the company.

(b)     <u>Premiere Global Services</u> – In December 2006, Crescendo, operating under the guise of the "Premiere Full Value Committee," launched a proxy fight to place two directors on Premiere's board, including Rosenfeld, to declassify the board, and to force the company to "retain a leading investment bank to explore all strategic alternatives...to maximize shareholder value."  Crescendo claimed a desire to work with Premiere's other directors with the "single goal [of] maximize[ing] the value of Premiere's common stock for the benefit of all shareholders."  Instead, after four months, Crescendo entered into a settlement with Premiere, agreeing to withdraw its nominees and vote for the Company's nominees in exchange for the Company's agreement to borrow $150 million and commence a self-tender offer for 17 percent of its outstanding stock, allowing Crescendo and its collaborators on the "Premiere Full Value Committee" to cash out.

(c)     <u>Topps Company</u> – Crescendo initially launched a proxy fight purportedly to split up the Topps Company ("Topps") or to sell the entire company.  Crescendo initially

obtained three seats on Topps' Board; however, when the company announced a sale of Topps to Michael Eisner's Tornante Company and private equity firm, Madison Dearborn LLC, Crescendo and its allies under the pseudonym, "Committee to Enhance Topps," again sought to disrupt Topps' plan for their own gain  Indeed, the Delaware Chancery Court noted that defendant Ajdler refused several offers to participate in the negotiations with Eisner "but felt free to pester . . . [the] directors who were actively involved in the negotiations with a series of nuisance emails" and "act[ed] as a backseat driver by carping at [the lead director] through emails."  Although ultimately unsuccessful in derailing the sale, Crescendo's tactics forced Topps to expend substantial resources defending itself and its deal with Eisner and Madison Dearborn.

(d)     O'Charleys Incorporated – On November 15, 2007, Crescendo filed a Schedule 13D announcing that it had acquired 8.5 percent of the outstanding stock of O'Charleys, and stating that it had "no present plan or proposal" to, among other things, change the composition of the O'Charleys board, seek to have the company sell assets or engage in any extraordinary transactions.  One month later, Crescendo belatedly disclosed its intent to nominate Arnaud Ajdler to the Board unless the company agreed to "maximize shareholder value [through]: (i) a repurchase of shares; (ii) a sale of real estate assets; (iii) a sale of the Company's restaurant concept; (iv) refranchising; and (v) an outright sale of the issuer."

**Defendants Target Charming Shoppes**

34.     Beginning in late 2007, the Myca Defendants began accumulating shares of Charming Shoppes common stock, and Myca began to "shop" Charming Shoppes to other hedge funds, in the hopes of enlisting allies to launch a proxy solicitation seeking representation on the Board of Charming Shoppes.

35.     Indeed, according to a January 18, 2008 Schedule 13D filed by non-parties Ramius Capital ("Ramius") and RCG Starboard Advisors ("Starboard"), the Myca Defendants in late 2007 began soliciting others to work in collaboration with it in order to covertly accumulate Charming Shoppes stock:

> In late 2007, certain of the Reporting Persons had conversations with representatives of Myca Partners, Inc. regarding the possibility of forming a Section 13(d) group to execute upon an investment strategy with respect to [Charming Shoppes].

36.     According to the January 18, 2008 Schedule 13D, non-parties Ramius and Starboard decided against forming such a 13(d) group with the Myca Defendants.  However, non-party Starboard agreed to enter into a highly unusual profit sharing arrangement with the Myca Defendants to ensure both entities benefited from the inflation of the company's stock price.

37.     At no time have Defendants disclosed the extent of their solicitation of other investors to join their scheme, nor have they ever disclosed who else has joined or agreed to support their scheme.

**The Initial 13D Contains A Boilerplate Laundry List of the Possible Purposes of Defendants' Investment in Charming Shoppes And Is False And Misleading**

38.     On or around January 8, 2008, the Crescendo Defendants, filed their Initial Schedule 13D with the SEC.  The Initial Schedule 13D disclosed beneficial ownership of 6.2% of Charming Shoppes' outstanding shares.  In addition, under Item 4 of the Schedule 13D (which requires full and complete disclosure with respect to the filing person's "purpose" and "plans"), the Crescendo Defendants misleadingly stated that while the Crescendo Defendants "may in the future take such actions with respect to their investments in the Issuer [Charming Shoppes] as they deem appropriate including, without limitation, seek[ing] Board representation," the

Crescendo Defendants had no specific plans to obtain representation on the board of directors of Charming Shoppes.

39.     The Initial 13D plainly was false and misleading when filed because, notwithstanding Defendants' statements to the contrary, Defendants were not merely "considering" some or all of the actions above, but in fact already had decided on and were actively pursuing certain specific goals such as altering the composition of the board (by nominating the Individual Defendants and others for director positions on the board) and seeking either to promote an extraordinary corporate transaction (i.e., the sale of certain of the company's assets) or the repurchase of Defendants' stock by Charming Shoppes at a premium.

40.     Indeed, at the time the Initial 13D was filed, upon information and belief, the Crescendo Defendants had already formed a group with the Myca Defendants and other persons or entities who, in concert with them, would work to acquire Charming Shoppes shares and this group planned to launch or support a proxy contest by Myca and Crescendo to force its way onto Charming Shoppes board, to force Charming Shoppes to buy them out or to drive up the stock price on a short term basis until they could sell in the open market.

41.     The Initial 13D failed to disclose the Crescendo Defendants' agreements or understandings with the Myca Defendants to work together to influence or effect the direction of Charming Shoppes.  Item 6 of Schedule 13D requires that the person or entity filing the schedule disclose "any contracts, arrangements, understandings or relationships (legal or otherwise) among persons . . . with respect to any securities of the issuer . . . naming such persons with whom such contracts, arrangements, understandings or relationships have been entered into."

42.     By the time the Initial 13D was filed with the SEC, upon information and belief, the Defendants had agreed to form an alliance to further their undisclosed intentions regarding the Company.  But none of this was disclosed.

43.     Moreover, as discussed in paragraphs 34-37, well before the Initial 13D was filed, the Myca Defendants -- working in concert with the Crescendo Defendants -- had solicited Ramius and Starboard (and likely others) in an effort to obtain their assistance in the alliance to raid Charming Shoppes.  But none of this was disclosed in the Initial 13D (or the Amended 13D) and still has not been disclosed by Defendants.   Their efforts to enlist collaborators were disclosed only by Ramius and Starboard in their own separate 13D filing.

44.     Notwithstanding their formation of a group and their efforts to solicit other investors (many of which have joined in their past schemes), the Crescendo Defendants made no disclosures of any of their agreements, arrangements and understandings with the Myca Defendants or others and instead falsely disclosed under Item 6 that the only "contracts, arrangements or understandings" that existed at the time included "Crescendo Partners II, Crescendo Investments II, Crescendo Partners III, Crescendo Investments III and Eric Rosenfeld."

45.     The Initial 13D is also materially false and misleading because it fails to disclose the Myca Defendants' and Crescendo Defendants' prior misconduct in connection with their solicitation of proxies discussed above at paragraphs 30-33, including their use of materially false and misleading securities filings and proxy solicitation materials to conceal their self-interested motivation and their history as greenmailers.

**The Defendants File Another False And Misleading Schedule 13D**

46.     On January 15, 2008, the Crescendo Defendants, together with the Myca Defendants and the Individual Defendants, filed the Amended 13D.  The Amended 13D for the

first time discloses the existence of the so-called Charming Shoppes Full Value Committee (the "Committee"), consisting of the Defendants and Myca (but concealing the names of its other members).

47.     As discussed in paragraphs 30-33 above, this is not the first time that the Defendants have used the tactic of forming a so-called "Full Value" committee.  This device has been used by the Defendants in the past to confuse shareholders and to attempt to legitimatize themselves before soliciting shareholder votes.  The Full Value misnomer is indicative of Defendants' deceptive tactics because the Defendants in the past have sought and here seek to achieve "value" only for themselves at the expense of target companies and their shareholders.

48.     The Amended 13D, filed only seven days after the initial 13D had stated that Defendants had no present plan or intention to seek Board representation, also discloses for the first time that "the Committee is seeking representation on the [Charming Shoppes] Board of Directors" and that "Crescendo Partners II delivered a letter dated January 11, 2008 [only three days after the filing of the Initial 13D] to the Corporate Secretary of the Issuer" on January 14, 2008, "nominating Messrs. Ajdler, Appel and Frankfurt . . . for election to the Board at the Issuer's 2008 annual meeting of shareholders."

49.     In the letter addressed to the Company's board of directors, attached as an exhibit to the Amended 13D, Defendants' reveal their strategy with respect to Charming Shoppes, including their supposed "goals" of "exploring the sale of non-core assets," "slowing store expansion," "focusing on merchandise improvements," "streamlining operations" and "buying back a significant amount of shares with cash flow from operations and cash raised thorough asset sales."  The contents of this letter were disclosed by Frankfurt purportedly for Myca alone at a meeting with the Chief Financial Officer and Chief Operating Officer of Charming Shoppes prior to the filing of the Amended 13D.

50.     Thus, it was only after Defendants had accumulated almost 8% of Charming Shoppes' stock and filed a false and misleading Initial 13D, that Defendants first disclosed to the Company and the public their intention to nominate directors to Charming Shoppes' Board, wage a proxy fight and attempt to force a sale of corporate assets or other extraordinary transactions.  But even then, they did not disclose the true purpose and intent of their scheme.

51.     According to the Amended 13D, the Crescendo Defendants acquired a substantial amount of Company stock starting on December 17, 2007, several weeks <u>before</u> the filing of the false and misleading Initial 13D.

52.     The Amended 13D also shows that the Myca Defendants acquired a substantial amount of Company stock in late 2007, at the same time non-party Starboard and, upon information and belief, other investors, including Steel Partners, were approached by the Myca Defendants about the possibility of forming a group to raid the Company.

**Defendants Must Be Prevented From Continuing Their Unlawful Scheme**

53.     Defendants have violated and are continuing to violate the federal securities laws by failing to disclose their true intentions regarding the Company and their history of violating the federal securities law and using materially false and misleading proxies to deceive shareholders into believing they are legitimate investors, and would-be directors, when in fact their sole purpose of their proxy solicitation is to coerce Charming Shoppes into selling assets, borrowing money or expending precious resources to purchase Defendants' stock through a greenmail transaction or otherwise.

54.     Defendants should be enjoined from further violating the federal securities laws, and, absent corrective disclosures, should be enjoined from soliciting proxies or voting any shares acquired prior to such corrective disclosures.

55.     Charming Shoppes also requests that the Court require Defendants and any and all persons acting in concert with them to liquidate in an orderly fashion all of their Charming Shoppes shares acquired as part of the unlawful scheme described herein.

## **IRREPARABLE HARM**

56.     Unless Defendants are enjoined from continuing their unlawful conduct, Charming Shoppes, its shareholders and the investing public will continue to suffer irreparable injury in that, among other things:

(a)     The Charming Shoppes shareholders and the investing public will continue to be denied material information to which they are entitled under the federal securities laws and which is essential to informed investment decision making with respect to purchasing, selling and voting Charming Shoppes shares;

(b)     The market for Charming Shoppes shares will continue to be misled and disrupted;

(c)     The Defendants will continue to threaten using the Charming Shoppes shares acquired and held in violation of the federal securities laws to attempt to cause changes in the operation, structure and board composition of Charming Shoppes;

(d)     The widespread uncertainty created  by Defendants' conduct will continue to destabilize Charming Shoppes and its shareholders; and

(e)     Defendants will be permitted to unlawfully profit from their unlawful conduct.

## COUNT I

## VIOLATIONS OF SECTION 13(d) OF THE EXCHANGE ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER BY ALL DEFENDANTS

57.     Charming Shoppes incorporates by reference paragraphs 1 through 56.

58.     The primary purpose of Section 13(d) of the Exchange Act, and the rules and regulations promulgated by the SEC thereunder, is to alert companies, shareholders and the investing public generally to large, rapid aggregations or accumulations of stock that might represent a potential change in corporate control and to compel complete, accurate and timely disclosure of information critical to shareholders in making informed investment decisions.

59.     To achieve this purpose, Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1), and Rule 13d-1 promulgated thereunder, require that any person acquiring beneficial ownership of 5 percent or more of any class of securities of any company registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, must file a Schedule 13D with the SEC and any national exchange on which the Company's shares are registered (in this case the NASDAQ Global Select Market) within ten days of crossing the five percent threshold.

60.     In the Schedule 13D, the filing persons must fully and truthfully disclose (among other things) their purposes, plans and intentions with respect to the acquisition of such shares (Item 4).

61.     Rule 12b-20, 17 C.F.R. § 240.12b-20, specifically requires that the reporting persons also disclose "such further material information" as is necessary to make the information required in the Schedule 13D not misleading in light of the circumstances in which the required statements are made.

62.     As hereinabove alleged, the Initial 13D filing and the Amended 13D filing filed by Defendants fail to make the full and fair disclosure required by the Exchange Act and the rules promulgated thereunder.

63.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant relief against Defendants:

(A)     Preliminarily and permanently enjoining Defendants and all other persons acting in concert with or on behalf of Defendants, directly or indirectly, from making any additional false or misleading public statements and false and misleading public filings regarding Charming Shoppes, and from taking or attempting to take any further steps in furtherance of their unlawful conduct and scheme;

(B)     Adjudging and declaring that Defendants, as a group and individually, have violated Section 13(d) of the Exchange Act and the rules and regulations promulgated by the SEC thereunder;

(C)     Preliminarily and permanently enjoining Defendants, their servants, employees, agents and attorneys, and all persons acting for them or on their behalf or in concert or participation with them, from directly or indirectly: (i) violating Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder; and (ii) engaging in any further activities with respect to their shares until they have made adequate corrective disclosures as required by the Exchange Act;

(D)     Ordering Defendants to make immediate corrective disclosure of all material facts and to cure the material misstatements and omissions in the Initial and Amended Schedule 13D;

(E)     Ordering Defendants to divest themselves of any and all shares of Charming Shoppes stock that they unlawfully acquired in violation of the federal securities laws in accordance with and pursuant to a plan of divestiture ordered by the Court;

(F)     Awarding Charming Shoppes reasonable attorneys' fees, costs and disbursements of this action;

(G)     Ordering expedited discovery with respect to the claims alleged herein; and,

(H)     Awarding such other and further relief as this Court may deem just and proper.


Dated:  March 7, 2008

                                        DRINKER BIDDLE & REATH LLP


                                        _____
                                        Wilson M. Brown III
                                            Pa. Bar No. 25846 (ECF: wmb7063)
                                        Riley H. Ross III
                                            Pa. Bar No. 204676
OF COUNSEL:                             One Logan Square
                                        18th & Cherry Streets
Gregory A. Markel                       Philadelphia, PA 19103-6996
Martin L. Seidel                        215-988-2700
CADWALADER, WICKERSHAM                   215-988-2757 (facsimile)
    & TAFT LLP
One World Financial Center               Attorneys for Plaintiff
New York, NY 10281                       Charming Shoppes Inc.
212-504-6000)
212-504-6666 (facsimile)