UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARMING SHOPPES INC., <br><br> Plaintiff, <br><br> -against- <br><br> CRESCENDO PARTNERS II, L.P., CRESCENDO INVESTMENTS II, LLC, CRESCENDO PARTNERS III, L.P., CRESCENDO INVESTMENTS III, LLC, MYCA PARTNERS, INC., MYCA MASTER FUND, LTD., ARNAUD AJDLER, ERIC ROSENFELD, ROBERT FRANKFURT, <br><br> Defendants. | CIVIL ACTION <br><br> No. 08-1156 |

## AMENDED COMPLAINT

Plaintiff Charming Shoppes Inc. ("Charming Shoppes" or the "Company"), by its undersigned attorneys, alleges for its complaint against defendants Crescendo Partners II, L.P., Series Q, Crescendo Investments II, LLC, Crescendo Partners III, L.P., Crescendo Investments III, LLC (collectively, the "Crescendo Defendants"); Myca Partners, Inc., Myca Master Fund, Ltd. (collectively, the "Myca Defendants"); Arnaud Ajdler, Eric Rosenfeld, Robert Frankfurt (collectively, the "Individual Defendants," and together with the Crescendo Defendants and Myca Defendants, "Defendants"), upon knowledge as to its own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action for preliminary and permanent injunctive relief to prevent Defendants and their undisclosed associates from continuing to violate the federal securities laws and federal antitrust laws in furtherance of an unlawful plan, conceived and orchestrated by Defendants, to elect defendants Ajdler, Frankfurt and Michael Appel, to the Company's board of directors as part of their plan to force the Company to sell certain key assets or borrow money and buy back Defendants' shares in a stock buyback or to push up the short term price of the stock and sell their shares for a quick profit.

2.      Defendants' scheme violates the federal securities and antitrust laws, specifically: (1) Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission ("SEC") promulgated thereunder; (2) Section 14(a) of the Exchange Act and the rules and regulations of the SEC promulgated thereunder; and (3) Section 8 of the Clayton Antitrust Act of 1915 (the "Clayton Act") and should therefore by enjoined pursuant to Section 16 of the Clayton Act.

3.      As discussed in more detail below, Defendants, in violation of the federal securities laws have failed to disclose in their Schedule 13D filings or their proxy materials: (i) their history of violating the federal securities laws and abusing the proxy process to enrich themselves at the expense of the other shareholders of the small, vulnerable companies they target; (ii) their efforts to solicit other undisclosed collaborators to participate in their scheme, as well as their agreement to split any profits generated by their scheme with at least one undisclosed hedge fund; (iii) that, because a

- 2 -

wholly-owned subsidiary of Charming Shoppes is a national bank, Defendants' proxy solicitation may violate the notice provisions of the Change in Bank Control Act of 1978 (the "Bank Control Act") and that pursuant to the Bank Control Act, Defendants may be prohibited from voting any proxies at the Company's May 8, 2008 Annual Meeting (the "Annual Meeting"), effectively disenfranchising any shareholder who gives them their proxy. Moreover, because Defendants' agents are members of the board of directors of one of Charming Shoppes' competitors, Defendants are prohibited by Section 8 of the Clayton Act from placing their agents on the board of Charming Shoppes.

## Defendants' Violations Of Section 13(d) Of The Exchange Act

4.      The purpose of Section 13(d) is to alert the marketplace to large or rapid aggregations of securities that are indicative of a potential shift in corporate control and to provide investors with the information they need to make informed decisions concerning the future of their investment. This is accomplished by requiring persons having beneficial ownership of more than five percent of the equity securities of any publicly traded company to file disclosures with the SEC on a Schedule 13D setting forth, among other things, their identity and background, any plans or intentions with respect to the issuer, whether the party has been enjoined or found to have violated federal or state securities laws, as well as any agreements, arrangements or understandings they have among themselves or with others concerning the issuer's securities.    They are also required to make disclosures regarding any subsequent increases in their holdings.

5.      In order to prevent a group of investors from surreptitiously obtaining more than five percent of the equity of an issuer through multiple buyers, Section 13(d) and the rules thereunder require that any such group acting together

disclose all group members, their aggregate holdings and the terms of any agreements or understandings among them with respect to the targeted company. Defendants' failure to comply with these provisions has thwarted the purpose of Section 13(d) and deprived Charming Shoppes' public investors of these protections.

6.      As discussed in greater detail below, on January 8, 2008, the Crescendo Defendants filed a Schedule 13D (the "Initial 13D," a true and correct copy of which is attached hereto as Exhibit A), stating that the Crescendo Defendants had no present intention or plan that would result in a change to the Company's board of directors and disingenuously claiming that they "may" at some point in the future seek board representation. The Crescendo Defendants' true plan, at that time, however, consisted of working in concert with the Myca Defendants (whose existence and involvement were as yet undisclosed), the Individual Defendants and possibly other undisclosed collaborators to abuse the proxy process to enrich themselves at the expense of Charming Shoppes and its unsuspecting shareholders.

7.      On January 15, 2008, only seven days after the Initial 13D filing, the Crescendo Defendants for the first time disclosed in an amended Schedule 13D (the "Amended 13D," a true and correct copy of which is attached hereto as Exhibit B), in part, their scheme of collaborating with the Myca Defendants and Individual Defendants. In that regard, the Amended 13D discloses that on January 11, 2008 -- only 3 days after filing their Initial 13D -- Defendants formed a group and drafted a letter nominating three persons for election to the Company's board of directors. As has been their practice and pattern with respect to other companies they have targeted, Defendants' scheme -- which still has not been accurately disclosed -- has always been to threaten a change to Charming Shoppes' board of directors in order to force Charming Shoppes to sell

- 4 -

Company assets, or borrow money and then repurchase the Defendants' shares at a profit in either a stock buyback or a greenmail transaction, or through their threats and other actions, cause a short term increase in the price of Charming Shoppes stock so that Defendants and their collaborators can sell their shares at a profit in the open market. Defendants' actions will irreparably harm Charming Shoppes and its shareholders.

8.      Moreover, Defendants' true intent is demonstrated by their agreement -- which was not disclosed in their Initial 13D or Amended 13D -- with a non-party, RCG Starboard Fund ("Starboard"), to split the trading gains obtained when Defendants and their collaborators eventually sell their Charming Shoppes stock. Defendants' omission of their profit sharing deal with Starboard -- as well as their undisclosed effort in December 2007 to solicit Ramius Capital, another hedge fund, to join their group -- violates the requirements of Items 5 and 6 of Schedule 13D.

9.      While Defendants in their Amended 13D disclosed part of their collaboration with the Myca Defendants, Defendants did not disclose and have never disclosed that, upon information and belief, they have solicited numerous other hedge funds to join their scheme, and likely are acting as a "group" with other unnamed persons or entities who, in concert with them, have acquired Charming Shoppes shares as part of Defendants' scheme. Furthermore, by delaying the filing of their Schedule 13D and concealing the full membership of their group, Defendants surreptitiously accumulated at least eight percent of Charming Shoppes outstanding stock without making any disclosure to the investing public -- as required by Section 13(d) -- that they were colluding to seize control of Charming Shoppes for their own benefit.

10.      Defendants also failed to disclose, both in their Initial 13D filing and Amended 13D filing, their history of violating federal securities laws and abusing the

proxy process for short-term financial gain. They have depicted themselves to the investing public as legitimate investors and "would-be" directors, when in truth their intention is to achieve personal gain at the expense of Charming Shoppes and its shareholders.

11. Nor have Defendants disclosed their practice of routinely making false and misleading securities filings in order to conceal their self-interested motivation from the companies they target and those companies' public shareholders.

## Defendants' Violations Of Section 14(a) Of The Exchange Act

12. Section 14(a) of the Exchange Act and the SEC rules thereunder are intended to protect shareholders from abuses in the solicitation of proxies, and require that any person seeking the authority to vote shareholders' proxies provide shareholders with all material information necessary to make an informed decision about the character, integrity and intentions of the persons seeking their proxy.

13. To that end, the securities laws and the rules promulgated by the SEC require that any person who solicits authority from shareholders to vote their shares make disclosure of specified information in a proxy statement. In this regard, Rule 14a-3 requires that the proxy statement specify who is making the solicitation, provide pertinent background information including any history of unlawful conduct or involvement with other companies, as well as disclose the purpose of the solicitation and the backgrounds of the directors for whom the person seeking the proxy intends to vote and why. Specifically, Rule 14a-3 requires that proxy statements contain the information specified in Schedule 14A. Item 7 of Schedule 14A details the information required to be included if a proxy solicitation involves action to be taken with respect to the election of directors. With regard to a director nominee, Item 7 requires the disclosure of, among other things,

the nominee's involvement in any proceedings adverse to the registrant, the nominee's transactions involving the registrant and the nominee's independence.

14.     Furthermore, the securities laws and rules promulgated by the SEC prohibit fraudulent or misleading proxy solicitations. Specifically, Rule 14a-9 prohibits the misrepresentation or omission of material facts in "any proxy statement, form of proxy, notice of meeting or other communication, written or oral…with respect to the solicitation of a proxy."

15.     As discussed in greater detail below, on March 14, 2008, Defendants filed with the SEC a materially false and misleading Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy," a true and correct copy of which is attached hereto as Exhibit C), seeking shareholder support to elect three director nominees to the board of Charming Shoppes. On March 20, 2008, Defendants filed an Amended Preliminary Proxy Statement (the "Amended Proxy," a true and correct copy of which is attached hereto as Exhibit D). Like Defendants' Initial 13D and their Amended 13D, Defendants' Preliminary Proxy and Amended Proxy (together, the "Proxies") simply fail to disclose Defendants' past violations of the securities laws, their disregard of other shareholders' interests and their track record of plundering companies.

16.     In that regard, the Proxies depict Defendants as shareholders with concerns about the Company and plans to improve its performance, but Defendants once again fail to disclose their true intention -- to achieve personal gain at the expense of Charming Shoppes and its shareholders.

17.     The Proxies also fail to disclose that Defendants have solicited and likely assembled an undisclosed group of collaborators to assist them in exploiting Charming Shoppes and its shareholders. In this regard, Defendants do not disclose and

- 7 -

have never disclosed that they have solicited at least one and likely numerous other hedge funds to join their scheme and are almost certainly acting as a "group" with other unnamed persons or entities who, in concert with them, have acquired Charming Shoppes shares as part of Defendants' scheme. Indeed, Defendants failed to disclose their unusual profit sharing arrangement with Starboard in their Initial 13D, their Amended 13D, as required by Items 5 and 6 of Schedule 13D, or in their Preliminary Proxy and only belatedly make a materially false and misleading disclosure in their Amended Proxy of the existence of the profit splitting deal that misleadingly "confirms" that Starboard and Defendants will make their own independent voting decisions, when in fact the profit splitting arrangement makes clear that -- to the contrary -- Defendants and Starboard have nothing to gain from voting independently. Defendants' Proxies, moreover, still fail to disclose that in December 2007 -- before Crescendo filed its Initial 13D claiming to be acting alone and disavowing any present plans to seek board representation -- Defendants were soliciting Ramius (and likely others) to join them in launching a proxy fight against Charming Shoppes.

18.    Additionally, the Proxies fail to disclose that defendant Ajdler sits on the board of Mothers Work, Inc. ("Mothers Work"), a competitor of Charming Shoppes, as the designee of Crescendo Partners. Federal law prohibits any person or his or her agent from simultaneously serving on the boards of directors of two competitors, and as discussed below, seating defendant Ajdler (*or any other agent* of Defendants) would violate Section 8 of the Clayton Act, 15 U.S.C. § 19. As such, Defendants' Proxies are materially misleading because they fail to disclose that, even if elected, Defendants' nominees cannot, under federal antitrust laws, serve on the board of Charming Shoppes.

19.     Defendants also nowhere disclose the potential impact on their proxy solicitation of the Change in Bank Control Act, 12 U.S.C. § 1817(j) (2007), as interpreted and applied by the Office of the Comptroller of the Currency ("OCC"), 12 C.F.R. § 5.50 (2007). In this regard, Defendants fail to disclose that they may be required to comply with the Bank Control Act's notice provisions and OCC filing requirements, which require that any person that seeks to acquire control of a national bank or the parent of a national bank (as defined by the Act and applicable regulations) first provide at least sixty days written notice of the change of control of such national bank or its parent to the OCC, unless otherwise exempted under the Act or under OCC regulations. Under the Bank Control Act, a person who obtains the power to vote more than ten percent of the common stock of any national bank or any company that directly or indirectly owns a national bank, must: (i) file an application with the OCC; (ii) publish notice of its intent to take control of the bank; and (iii) await the conclusion of a sixty-day OCC review and public comment period *before* they can vote those shares.

20.     Spirit of America National Bank ("America National") is a wholly-owned subsidiary of Charming Shoppes. America National is a national bank, regulated by the OCC. By seeking to obtain proxies of a majority of the shares of Charming Shoppes, Defendants may be required to comply with the Bank Control Act, including the appropriate waiting period *before* voting such proxies. To date, Defendants have not even submitted the requisite application to the OCC.

21.     The Company's Annual Meeting will be held on May 8, 2008, a mere 44 days from today. The Proxies fail to disclose that Defendants may not have complied with the requirements of the Bank Control Act, that such non-compliance may mean that Defendants cannot vote any proxies at the Annual Meeting and that any

shareholder who gives Defendants his proxy may, therefore, be effectively disenfranchised.

22.    Finally, Proposal No. 2 in Defendants' Proxies, soliciting votes against re-approval of certain performance guidelines for the Company's 2003 Incentive Compensation Plan, is also materially false and misleading because it fails to disclose that failing to re-approve the performance guidelines will not decrease executive compensation and increase shareholder value. In that regard, Proposal No. 2, advanced by the Company in its own proxy statement, seeks re-approval of the material terms of the performance goals under the Company's 2003 Incentive Compensation Plan. In their Proxies, Defendants make the unfounded claim that Charming Shoppes' senior management has received "excessive compensation" and urge shareholders to vote against the Company's proposal. Defendants fail to disclose, however, that the rejection of Proposal No. 2 may cause all or a portion of future bonus amounts paid under the Incentive Compensation Plan to be non-deductible under Section 162(m) of the Internal Revenue Code, resulting in substantial additional taxes and other costs to the Company.

## Defendants' Scheme Violates Section 8 Of The Clayton Act

23.    In addition, Defendants must be enjoined pursuant to Section 16 of the Clayton Act from seeking to elect any of their representatives or agents to the board of Charming Shoppes because such representation would violate Section 8 of the Clayton Act, 15 U.S.C. § 19, which prohibits interlocking directorates among competing corporations. Unconcerned with the requirements of the Clayton Act, Defendants have proposed defendant Ajdler as a director nominee despite the fact that he sits on the board of Mothers Work, a competitor of the Company. Moreover, two other representatives of Crescendo sit on the Mothers Work board. As a result, Section 8 precludes any

representative or agent of Crescendo from serving on the board of Charming Shoppes. Thus, the election of any of Defendants' nominees (*or any other agent or deputy* of Defendants), to the board of Charming Shoppes, would violate Section 8 of the Clayton Act.

24.     In this regard, Section 8 prohibits any person from serving as a director or officer in any two corporations that have capital, surplus and undivided profits in excess of $25.3 million and competing sales in excess of approximately $2.53 million. The purpose of Section 8 is to prohibit any interlocking directorates among competing corporations without regard to the two companies' market shares or the specific effect the interlock may have on competition as a prophylactic against the risk of anticompetitive conduct.     Indeed, Section 8 is intended to prevent the mere opportunity for two competitors to coordinate -- directly or indirectly -- their business activities through common directors.

25.     On information and belief, Mothers Work, Inc. sells women's apparel, including maternity apparel and has annual sales in the United States of $581.4 million and has capital, surplus and undivided profits in excess of $25.3 million, the threshold for the application of Section 8.   Charming Shoppes is a multi-brand, multi-channel retailer of women's apparel, including maternity apparel, in the United States with annual sales of $3 billion and capital, surplus and undivided profits in excess of $25.3 million.

26.     Nevertheless, in direct violation of Section 8 of the Clayton Act, Defendants are seeking representation on the Charming Shoppes board, even though one of their nominees, Arnaud Ajdler, serves as a director of Mothers Work.   Defendant Ajdler is a Managing Director of defendant Crescendo Partners and was named to the

Mothers Work board as Crescendo's representative. As such, he is Defendants' agent or deputy under the Clayton Act, and neither he nor any other representative of Defendants may serve on Charming Shoppes' board.

27.     Unless injunctive relief is ordered, Charming Shoppes and its shareholders will be irreparably harmed as a result of the antitrust law violations described herein.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The claims in this action arise under Sections 13(d) and 14(a) of the Exchange Act and Rules 13d-1, 14a-3 and 14a-9 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. §§ 240.13d-1, 240.14a-3 and 240.14a-9.

29.     This action is also brought pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 8 of the Clayton Act, 15 U.S.C. § 19. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Charming Shoppes seeks preliminary and permanent injunctive relief to prevent further injury and the continuation of such violations.

30.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), and Section 12 of the Clayton Act, 15 U.S.C. § 22. Many of the acts, transactions and conduct constituting violations of the Exchange Act, including the dissemination of false and misleading information, occurred, at least in part, in this District.

- 12 -

31.     Acts and transactions constituting and in furtherance of the violations of the law have occurred, are occurring and, unless enjoined, will continue to occur, in this District.   The actions cited have been carried out by the means and instrumentalities of interstate commerce and by the use of the United States mail.

## THE PARTIES

32.     Plaintiff Charming Shoppes Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Bensalem, Pennsylvania.   Charming Shoppes is a leading multi-brand, multi-channel specialty apparel retailer with a leading market share in women's plus-size specialty apparel.   The Company's retail stores segment operates retail stores and related e-commerce websites through such distinct brands as Lane Bryant, Fashion Bug, Catherine's Plus Sizes, Lane Bryant Outlet and Petite Sophisticate Outlet.   As of February 2008, the Company operated 2,378 stores in 48 states.   Charming Shoppes' shares are registered pursuant to Section 12 of the Exchange Act and are publicly traded on the NASDAQ Global Select Market.

33.     Crescendo Partners II, L.P., Series Q, is a Delaware limited partnership with its principal place of business in New York, New York.

34.     Crescendo Investments II, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

35.     Crescendo Partners III, L.P., is a Delaware limited partnership with its principal place of business in New York, New York.

36.     Crescendo Investments III, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

37.    Crescendo Investments II is the general partner of Crescendo Partners II. Crescendo Investments III is the general partner of Crescendo Partners III. The managing member of each of Crescendo Investments II and Crescendo Investments III is Eric Rosenfeld.

38.    According to the Initial 13D filing, "the principal business of Crescendo Partners II is investing in securities. The principal business of Crescendo Investments II is acting as the general partner of Crescendo Partners II. The principal business of Crescendo Partners III is investing in securities. The principal business of Crescendo Investments III is acting as the general partner of Crescendo Partners III. The principal occupation of Mr. Rosenfeld is serving as the managing member of Crescendo Investments II, Crescendo Investments III and as the managing member of the general partner of Crescendo Partners, L.P., whose principal business is investing in securities."

39.    The Crescendo Defendants collectively operate a New York-based investment firm formed in 1998.

40.    Defendant Eric Rosenfeld is the managing member of Crescendo Investments II, Crescendo Investments III and the managing member of the general partner of Crescendo Partners, L.P.

41.    Defendant Myca Master Fund, Ltd., is a Cayman Islands company, with its principal place of business in New York, New York. Myca Master Fund, Ltd's principal business is "investment advisory services."

42.    Defendant Myca Partners Inc. is a Delaware corporation with its principal place of business in New York, New York. Myca Partners Inc.'s principal business involves rendering "investment advisory services and serving as the investment manager of Myca Master Fund."

43.     The Myca Defendants collectively operate an advisory services firm located in New York, New York.

44.     Defendant Arnaud Ajdler has been a Managing Director of Crescendo Partners II, L.P., since December 2005.

45.     Defendant Robert Frankfurt has served as President of Myca Partners since September 2006.

## FACTUAL BACKGROUND

46.     As discussed in paragraphs 52 through 90 below, beginning in or around December 2007, Defendants steadily increased their stake in Charming Shoppes with a goal of launching a proxy fight ostensibly to obtain representation on the Company's board of directors.  In truth, Defendants are seeking to use the threat of a disruptive proxy fight to force a sale of certain Company assets, and coerce the Company to buy their shares through a stock buy back program or a greenmail transaction.  Defendants did not disclose these efforts in the Initial 13D filing, nor have they disclosed the true extent of their scheme in the Amended 13D filing.

### Defendants' Undisclosed History As Corporate Raiders

47.     Over the past several years, Defendants have targeted vulnerable companies (often smaller capitalization companies that have suffered recent stock price declines), accumulating significant equity stakes, and threatening to conduct hostile proxy contests in order to elect their designees to the companies' boards of directors, with the intention from the outset of being disruptive to management for purposes of forcing a sale of the company, a stock buy back, extraordinary dividend or the repurchase of their shares.

## Myca Defendants' and Defendant Frankfurt's History As Corporate Raiders

48. Defendant Frankfurt and his company Myca Partners are notorious "activist investors" with a sordid history of misusing the proxy process to profit at the expense of targeted companies and their shareholders. In this regard, prior to joining Myca Partners, Defendant Frankfurt was a partner at Steel Partners, a New York-based hedge fund. During his tenure at Steel Partners, Frankfurt and Steel Partners launched numerous proxy fights in order to coerce target companies into selling the company, buying their stock at a premium (often through greenmail) or leveraging the company or selling assets to pay Steel Partners and its collaborators with share buy-backs or extraordinary dividends. In each instance, Frankfurt and Steel Partners filed a false and misleading Schedule 13D that masked, rather than disclosed, their true intention of launching a proxy fight to either take control of the company or to force a greenmail repurchase:

(a) Puroflow Inc. -- On August 5, 1998, Frankfurt and Steel filed a Schedule 13D in which Steel stated that it had amassed an 11.9 percent holding in Puroflow for "investment purposes" only and had no plans to seek representation on Puroflow's board, the sale of Puroflow or its assets or any other extraordinary transaction. Steel then began amassing a much larger stake (more than 15 percent of Puroflow) and prior to Puroflow's next annual meeting formed the "Puroflow Full Value Committee," and launched a proxy fight to seize control of Puroflow's board and force a sale of the Company. After months of costly litigation, Steel forced Puroflow to place its nominees on the board and forced the ultimate sale of the Company.

(b) Aydin Corp. -- On August 10, 1998, Steel filed a Schedule 13D for Aydin Corporation, claiming that it believed Aydin to be "an attractive investment" and

- 16 -

disclaiming any plan to seek seats on the board or seek the sale of Aydin or its assets. One month later Frankfurt and Steel formed the "Aydin Full Value Committee," and disclosed for the first time that they had concluded that Aydin should sell itself and that they were launching a proxy fight to seize control of the board and force a sale of the Company.    Rather than fight a costly proxy fight, Aydin agreed to place two representatives of Steel's group on its board and within six months agreed to sell itself to L-3 Communications, permitting Frankfurt and his collaborators to sell their shares at a hefty profit.

(c)    Bell Industries -- On December 22, 1998, Steel filed a Schedule 13D, stating that it had acquired 5.95 percent of the common stock of Bell Industries. Once again, its Schedule 13D claimed that its purchases were for investment purposes only and that it had no plans to seek seats on the board or the sale of the Company or its assets.    Three weeks later, after increasing its stake to over 10 percent, Steel and Frankfurt announced their plan to launch a proxy fight to place Frankfurt and three of his cronies on Bell's board, giving them control of the board.  Steel waged a nearly year-long fight to obtain representation on Bell's board purportedly to "give [ ] all the Company's shareholders an opportunity to receive maximum value for their shares."    Then, on December 23, 1999, Steel and Frankfurt cashed in, selling the bulk of their holding within a week and walking away from Bell and its public shareholders.

49.    Moreover, in 1996, in connection with its solicitation of proxies for Medical Imaging Centers of America, Inc., Steel Partners was preliminarily enjoined by the United States District Court for the Southern District of California from voting certain shares of its stock in a proxy contest.  The court there found a "high probability" that the plaintiff would succeed in establishing that Steel Partners and other members of its

- 17 -

undisclosed group had violated Section 13(d) of the Exchange Act by failing to disclose, among other things, the existence of undisclosed collaborators in its effort to take control of the company.

**Crescendo Defendants' History As A Corporate Raider**

50.     Crescendo too has a sordid history of corporate raids and short term profit grabs at the expense of the target company and its other shareholders. Indeed, Eric Rosenfeld, the President and CEO of Crescendo Partners, a self-proclaimed "barbarian," has a well-deserved reputation for preying on small and struggling companies, launching proxy contests to force his way onto boards, and forcing companies to sell assets or borrow money and engage in share buybacks, extraordinary dividends or other transactions that allow him and his collaborators to obtain short term gains at the expense of the target companies and their public shareholders.

51.     The Crescendo Defendants' modus operandi, like that of defendant Frankfurt, is to surreptitiously accumulate a significant stock position before making disclosures under Section 13(d) -- often in collaboration with unnamed partners. Even though its initial 13D filing invariably disclaims any intention to seek control of its target company, Crescendo normally (after amassing additional shares) threatens to conduct hostile proxy contests to elect its designees to the company's board of directors with the intention of either forcing a sale of the company, dismantling the company and selling off the pieces, forcing the greenmail repurchase of its shares at a profit or inflating on a short term basis the price of the stock so that it can profit by selling their shares in the marketplace.

(a)     Computer Horizons Corporation -- In 2005 and 2006, Crescendo waged a campaign to seize control of the board of directors of Computer Horizons

Corporation.   On July 22, 2005, Crescendo filed a Schedule 13D on behalf of the "Computer Horizons Full Value Committee," stating that it had no "present plan or proposal which would relate to, among other things, any sale of Computer Horizons or a material amount of its assets."   Five days later, Crescendo filed an amended Schedule 13D seeking to remove Computer Horizons' directors and replace them with Crescendo's nominees. After a bitter four month proxy fight, Crescendo and the other members of its "Full Value Committee" obtained control of Computer Horizons' board and promptly awarded themselves tens of thousands of stock options and generous cash retainers. Crescendo and its cronies then broke Computer Horizons up, sold the pieces and liquidated the company.

       (b)    <u>Premiere Global Services</u> -- In December 2006, Crescendo, operating under the guise of the "Premiere Full Value Committee," launched a proxy fight to place two directors on Premiere's board, including Rosenfeld, to declassify the board, and to force the company to "retain a leading investment bank to explore all strategic alternatives...to maximize shareholder value."   Crescendo claimed a desire to work with Premiere's other directors with the "single goal [of] maximize[ing] the value of Premiere's common stock for the benefit of all shareholders."   Instead, after four months, Crescendo entered into a settlement with Premiere, agreeing to withdraw its nominees and vote for the company's nominees in exchange for the company's agreement to borrow $150 million and commence a self-tender offer for 17 percent of its outstanding stock, allowing Crescendo and its collaborators on the "Premiere Full Value Committee" to cash out.

       (c)    <u>Topps Company</u> -- Crescendo initially launched a proxy fight purportedly to split up the Topps Company ("Topps") or to sell the entire company.

- 19 -

Crescendo initially obtained three seats on Topps' board; however, when the company announced a sale of Topps to Michael Eisner's Tornante Company and private equity firm, Madison Dearborn LLC, Crescendo and its allies under the pseudonym, "Committee to Enhance Topps," again sought to disrupt Topps' plan for their own gain Indeed, the Delaware Chancery Court noted that defendant Ajdler refused several offers to participate in the negotiations with Eisner "but felt free to pester . . . [the] directors who were actively involved in the negotiations with a series of nuisance emails" and "act[ed] as a backseat driver by carping at [the lead director] through emails." Although ultimately unsuccessful in derailing the sale, Crescendo's tactics forced Topps to expend substantial resources defending itself and its deal with Eisner and Madison Dearborn.

        (d)     O'Charleys Incorporated -- On November 15, 2007, Crescendo filed a Schedule 13D announcing that it had acquired 8.5 percent of the outstanding stock of O'Charleys, and stating that it had "no present plan or proposal" to, among other things, change the composition of the O'Charleys board, seek to have the company sell assets or engage in any extraordinary transactions. One month later, Crescendo belatedly disclosed its intent to nominate Arnaud Ajdler to the board unless the company agreed to "maximize shareholder value [through]: (i) a repurchase of shares; (ii) a sale of real estate assets; (iii) a sale of the Company's restaurant concept; (iv) refranchising; and (v) an outright sale of the issuer."

**Defendants Target Charming Shoppes**

        52.     Beginning in late 2007, the Myca Defendants began accumulating shares of Charming Shoppes common stock, and Myca began to "shop" Charming Shoppes to other hedge funds, in the hopes of enlisting allies to launch a proxy solicitation seeking representation on the board of Charming Shoppes.

53.     Indeed, according to a January 18, 2008 Schedule 13D filed by non-parties Ramius Capital ("Ramius") and RCG Starboard Advisors ("Starboard"), the Myca Defendants in late 2007 began soliciting others to work in collaboration with it in order to covertly accumulate Charming Shoppes stock:

> In late 2007, certain of the Reporting Persons had conversations with representatives of Myca Partners, Inc. regarding the possibility of forming a Section 13(d) group to execute upon an investment strategy with respect to [Charming Shoppes].

54.     According to the January 18, 2008 Schedule 13D, non-parties Ramius and Starboard decided against forming such a 13(d) group with the Myca Defendants. However, non-party Starboard agreed to enter into a highly unusual profit sharing arrangement with the Myca Defendants to ensure both entities benefited from the inflation of the Company's stock price.

55.     At no time have Defendants disclosed the extent of their solicitation of other investors to join their scheme, nor have they ever disclosed who else has joined or agreed to support their scheme.

**The Initial 13D Contains A Boilerplate Laundry List of the Possible Purposes of Defendants' Investment in Charming Shoppes And Is False And Misleading**

56.     On or around January 8, 2008, the Crescendo Defendants, filed their Initial Schedule 13D with the SEC. The Initial Schedule 13D disclosed beneficial ownership of 6.2% of Charming Shoppes' outstanding shares. In addition, under Item 4 of the Schedule 13D (which requires full and complete disclosure with respect to the filing person's "purpose" and "plans"), the Crescendo Defendants misleadingly stated that while the Crescendo Defendants "may in the future take such actions with respect to their investments in the Issuer [Charming Shoppes] as they deem appropriate including,

- 21 -

without limitation, seek[ing] Board representation," the Crescendo Defendants had no specific plans to obtain representation on the board of directors of Charming Shoppes.

57.     The Initial 13D plainly was false and misleading when filed because, notwithstanding Defendants' statements to the contrary, Defendants were not merely "considering" some or all of the actions above, but in fact already had decided on and were actively pursuing certain specific goals such as altering the composition of the board (by nominating the Individual Defendants and others for director positions on the board) and seeking either to promote an extraordinary corporate transaction (*i.e.*, the sale of certain of the company's assets) or the repurchase of Defendants' stock by Charming Shoppes at a premium.

58.     Indeed, at the time the Initial 13D was filed, upon information and belief, the Crescendo Defendants had already formed a group with the Myca Defendants and other persons or entities who, in concert with them, would work to acquire Charming Shoppes shares, and this group planned to launch or support a proxy contest by Myca and Crescendo to force its way onto Charming Shoppes board, to force Charming Shoppes to buy them out or to drive up the stock price on a short term basis until they could sell in the open market.

59.     The Initial 13D failed to disclose the Crescendo Defendants' agreements or understandings with the Myca Defendants to work together to influence or effect the direction of Charming Shoppes.  Item 6 of Schedule 13D requires that the person or entity filing the schedule disclose "any contracts, arrangements, understandings or relationships (legal or otherwise) among persons . . . with respect to any securities of the issuer . . . naming such persons with whom such contracts, arrangements, understandings or relationships have been entered into."

60.     By the time the Initial 13D was filed with the SEC, upon information and belief, the Defendants had agreed to form an alliance to further their undisclosed intentions regarding the Company.  But none of this was disclosed.

61.     Moreover, as discussed in paragraphs 52 through 55, well before the Initial 13D was filed, the Myca Defendants -- working in concert with the Crescendo Defendants -- had solicited Ramius and Starboard (and likely others) in an effort to obtain their assistance in the alliance to raid Charming Shoppes.  But none of this was disclosed in the Initial 13D or the Amended 13D.  Their efforts to enlist collaborators were disclosed only by Ramius and Starboard in their own separate 13D filing.

62.     Notwithstanding their formation of a group and their efforts to solicit other investors (many of which have joined in their past schemes), the Crescendo Defendants made no disclosures of any of their agreements, arrangements and understandings with the Myca Defendants or others and instead falsely disclosed under Item 6 that the only "contracts, arrangements or understandings" that existed at the time included "Crescendo Partners II, Crescendo Investments II, Crescendo Partners III, Crescendo Investments III and Eric Rosenfeld."   Indeed, in direct violation of the requirement of Item 6 of Schedule 13D, Defendants omitted any disclosure of their unusual profit sharing deal with Starboard.

63.     The Initial 13D is also materially false and misleading because it fails to disclose the Myca Defendants' and Crescendo Defendants' prior misconduct in connection with their solicitation of proxies discussed above at paragraphs 47 through 51, including their use of materially false and misleading securities filings and proxy solicitation materials to conceal their self-interested motivation and their practice of using

proxy fights to turn fast profits for themselves to the detriment of the target companies involved.

**The Defendants File Another False And Misleading Schedule 13D**

64.     On January 15, 2008, the Crescendo Defendants, together with the Myca Defendants and the Individual Defendants, filed the Amended 13D.  The Amended 13D for the first time discloses the existence of the so-called Charming Shoppes Full Value Committee (the "Committee"), consisting of the Defendants and Myca (but concealing the names of its other members).

65.     As discussed in paragraphs 48 through 51 above, this is not the first time that the Defendants have used the tactic of forming a so-called "Full Value" committee.   This device has been used by the Defendants in the past to confuse shareholders and to attempt to legitimatize themselves before soliciting shareholder votes.  The Full Value misnomer is indicative of Defendants' deceptive tactics because the Defendants in the past have sought and here seek to achieve "value" only for themselves at the expense of target companies and their shareholders.

66.     The Amended 13D, filed only seven days after the initial 13D had stated that Defendants had no present plan or intention to seek board representation, also discloses for the first time that "the Committee is seeking representation on the [Charming Shoppes] Board of Directors" and that "Crescendo Partners II delivered a letter dated January 11, 2008 [only three days after the filing of the Initial 13D] to the Corporate Secretary of the Issuer" on January 14, 2008, "nominating Messrs. Ajdler, Appel and Frankfurt . . . for election to the Board at the Issuer's 2008 annual meeting of shareholders."

67.     In the letter addressed to the Company's board of directors, attached as an exhibit to the Amended 13D, Defendants reveal their strategy with respect to Charming Shoppes, including their supposed "goals" of "exploring the sale of non-core assets," "slowing store expansion," "focusing on merchandise improvements," "streamlining operations" and "buying back a significant amount of shares with cash flow from operations and cash raised thorough asset sales." The contents of this letter were disclosed by Crescendo (purportedly for itself alone) at a meeting with, among others, the Chief Financial Officer of Charming Shoppes prior to the filing of the Amended 13D.

68.     Thus, it was only after Defendants had accumulated almost 8% of Charming Shoppes' stock and filed a false and misleading Initial 13D, that Defendants first disclosed to the Company and the public their intention to nominate directors to Charming Shoppes' board, wage a proxy fight and attempt to force a sale of corporate assets or other extraordinary transactions. But even then, they did not disclose the true purpose and intent of their scheme.

69.     According to the Amended 13D, the Crescendo Defendants acquired a substantial amount of Company stock starting on December 17, 2007, several weeks before the filing of the false and misleading Initial 13D.

70.     The Amended 13D also shows that the Myca Defendants acquired a substantial amount of Company stock in late 2007, at the same time non-party Starboard and, upon information and belief, other investors, including Steel Partners, were approached by the Myca Defendants about the possibility of forming a group to raid the Company.

**The Defendants File A False And Misleading Preliminary Proxy**

71.     Charming Shoppe's annual stockholder meeting is scheduled to be held on May 8, 2008.

72.     On March 14, 2008, the Crescendo Defendants, together with the Myca Defendants and the Individual Defendants, filed their Preliminary Proxy. The Preliminary Proxy is riddled with the same misstatements and omissions that plague Defendants' Initial 13D and their Amended 13D. Moreover, the Preliminary Proxy further violates the federal securities laws in that it fails to disclose that Defendants may not have complied with the requirements of the Bank Control Act, that such non-compliance may mean that Defendants will be precluded from voting any proxies at the Annual Meeting, effectively disenfranchising the shareholders granting those proxies, and that, as a result of Defendants' representatives serving as directors of Mothers Work, their nominees are prohibited from becoming directors of the Company by Section 8 of the Clayton Act.

73.     The Preliminary Proxy is materially misleading and violates Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 by failing to disclose the following information, which is material to an evaluation of the integrity of Defendants and their nominees and is required by Item 7 of Schedule 14A:

(a)     That defendant Frankfurt and his company Myca Partners are notorious "activist investors" with a history of misusing the proxy process to profit at the expense of targeted companies and their shareholders;

(b)     That defendants Crescendo and Rosenfeld also have a history of corporate raiding and proxy fights with a reputation for preying on small and

struggling companies to obtain short term gains at the expense of the target companies and their public shareholders;

(c)     That in December 2007 -- prior to Crescendo's claim in its Initial 13D that it was not part of a group and had no plan to seek board representation -- the Myca Defendants, working in concert with the Crescendo Defendants, had already solicited Ramius and Starboard (and likely others) in an effort to obtain their assistance in launching a proxy contest for Charming Shoppes; and

(d)     That Defendants entered into an undisclosed agreement with non-party Starboard, which provides for a highly unusual profit sharing arrangement between Starboard and the Myca Defendants.

74.     Defendants also nowhere disclose that they may have an obligation to comply with the notice provisions and OCC filing requirements of the Bank Control Act. Specifically, Defendants may have violated the Act's requirement that any person that seeks to acquire direct or indirect control of a national bank or vote proxies for more than ten percent of the outstanding stock of a national bank or its parent must first provide at least sixty-days written notice of the change of control to the OCC, unless otherwise exempted under the Act or under OCC regulations.

75.     Spirit of America National Bank, located in Miami Township, Ohio, is a wholly-owned subsidiary of Charming Shoppes. America National originates credit cards for several of the Company's apparel brands and is a national bank subject to the Bank Control Act and OCC regulation.

76.     By seeking to vote, by proxy or otherwise, more than ten percent of the shares of Charming Shoppes, Defendants may be required to file and publish an application for a change of control of America National with the OCC and may be

- 27 -

precluded from voting any proxies they receive until the expiration of a sixty-day review and public comment period.

77.     Charming Shoppes' Annual Meeting is scheduled to be held on May 8, 2008. Consequently, Defendants may have been required to have complied with the notice provisions of the Bank Control Act by March 9, 2008 -- 60 days prior to the Company's Annual Meeting. That date has now passed, and on information and belief, Defendants have failed to make any such filings or comply with the relevant notice provisions. The Preliminary Proxy does not disclose that Defendants may not have complied with the requirements of the Bank Control Act. Because fewer than 60 days remain until the Company's Annual Meeting, Defendants cannot comply with the notice provisions of the Bank Control Act before the Annual Meeting. Defendants may not be able to vote any proxies at the Annual Meeting, and any shareholder who gives Defendants his proxy may, therefore, be effectively disenfranchised. Defendants' failure to disclose the consequences of their potential noncompliance with applicable OCC regulations and federal banking law is a clear violation of Section 14(a).

78.     The Preliminary Proxy also misleads shareholders with respect to Proposal No. 2 in opposition of the re-approval of the material terms of the performance goals under the Company's 2003 Incentive Compensation Plan by implying that a vote against Proposal No. 2 will decrease compensation rewarded to senior management and increase shareholder value. In fact, non-approval of the performance goals under the 2003 Incentive Compensation Plan would be detrimental to shareholders because such non-approval may cause all or a portion of future bonus amounts paid under the plan to the Company's named executive officers (other than the chief financial officer) to be

non-deductible under Section 162(m) of the Internal Revenue Code, resulting in an additional cost to the Company.

79.    Section 162(m) of the Internal Revenue Code limits the deductibility of annual compensation in excess of $1 million to such persons, unless the compensation is "qualified performance-based compensation." If the performance goals are not re-approved, bonuses paid under the Incentive Compensation Plan will not be treated as "qualified performance-based compensation." The Preliminary Proxy fails to disclose that such non-approval does not limit the amount of compensation the Company may pay to senior executives and that the non-approval of the proposal may force the Company to incur additional expenses.

80.    Moreover, the statement in opposition to Proposal No. 2 also includes the following misstatement: "While shareholders have suffered as a result of the Company's stock performance, the top five listed senior executives have been awarded approximately $54.5 million in total compensation over the past four fiscal years." This statement overstates the total actual compensation awarded to the Company's top executives by assuming that the performance-based portion of each executive's total compensation package has already vested. Defendants also claim that the Company's senior management has received "excessive compensation" without providing a basis for this conclusion, such as a comparison to compensation practices at other top retailers.

81.    Finally, as discussed further in paragraphs 86 through 90 below, Defendants have failed to disclose that defendant Ajdler also sits on the board of Mothers Work, a competitor of Charming Shoppes as an agent or deputy of Crescendo Partners. Federal antitrust law prohibits interlocking directorates among competitors. Defendant Ajdler cannot serve on Charming Shoppes' board without violating Section 8 of the

Clayton Act.  Moreover, because Ajdler serves as Crescendo's representative on the Mothers Work board, neither he nor any of Defendants' nominees (*nor any other agent* of Defendants) may serve on the board of directors of Charming Shoppes.  Defendants' Preliminary Proxy simply omits any disclosure that electing their nominees would violate federal antitrust law.

## The Defendants File A False And Misleading Amended Proxy

82.     On March 20, 2008, the Crescendo Defendants, together with the Myca Defendants and the Individual Defendants, filed their Amended Proxy.  The Amended Proxy is materially misleading and in violation of the federal securities law for, *inter alia*, failing to disclose (a) that Defendants have a sordid history of misusing the proxy process, force small companies to sell assets or borrow money to buy back Defendants' stock or engage in an extraordinary transaction to drive up the short-term price of the targets' stock so Defendants can sell at a profit at the expense of the target and its shareholders; (b) that, upon information and belief, Defendants have solicited Ramius Capital, Starboard and likely other unnamed hedge funds to participate in the raid on Charming Shoppes; (c) that Defendants' scheme violates the Clayton Act; and (d) that because Defendants may have violated the notice provisions of the Bank Control Act, they may be precluded from voting any proxies at the Annual Meeting, effectively disenfranchising any shareholders that grant their proxies to Defendants.

83.     The Amended Proxy also fails to disclose that, as discussed above, a vote against Proposal No. 2 may result in additional tax liability and additional cost to the Company.

84.     Moreover, Defendants' Amended Proxy misrepresents their previously undisclosed fee arrangement with Starboard.  In that regard, Defendants

disclose that, on January 11, 2008, defendant Myca Partners entered into a fee arrangement with Starboard to compensate Myca Partners for bringing Charming Shopppes to Starboard's attention as a "potential investment opportunity." Pursuant to the terms of their arrangement, Starboard agreed to pay Myca Partners both an upfront fee and a fee based on the net profits of certain Starboard affiliates from their investments in Charming Shoppes. Defendants purport to "confirm" that Myca Partners and Starboard will make independent investment decisions, despite the fact that the agreement to share trading profits, if Defendants' actions cause the short-term price of Charming Shoppes' stock to increase, demonstrates that Defendants and Starboard have nothing to gain from acting independently.

85.     The omitted information is plainly material to shareholders who have a right to know that Defendants will enrich themselves at the shareholders' expense and without regard to applicable laws, rules or regulations. If Defendants are permitted to solicit proxies, pursuant to their false and misleading Amended Proxy, Charming Shoppes' shareholders will be forced to cast their votes without knowledge of Defendants' shady backgrounds and self-interested motives, and the shareholder protections implemented by the SEC pursuant to the Exchange Act will be eviscerated. Accordingly, unless the Court enjoins Defendants from soliciting proxies pursuant to their incomplete, false and misleading Proxies, Charming Shoppes and its shareholders will be irreparably harmed and Defendants will effectively deprive Charming Shoppes shareholders of their right to cast an informed vote or even a valid vote.

**The Election of Defendants' Nominees Would Violate Federal Antitrust Laws**

86.     In addition, Defendants should be enjoined from seeking any representation on the board of Charming Shoppes because such representation would violate Section 8 of the Clayton Act.

87.     On information and belief, defendant Ajdler is a director and member of the Compensation Committee of Mothers Work, Inc. -- a designer and retailer of maternity apparel in the United States with 1,576 retail locations, including 781 stores in all 50 states, Puerto Rico, Guam and Canada and 795 leased departments. Mothers Work is a publicly-traded company, listed on the NASDAQ Global Select Market, with net sales of $581.4 million for fiscal year 2007, according to the company's most recent 10-K.

88.     On information and belief, defendant Ajdler is an agent or deputy of defendant Crescendo Partners, having been employed as a Managing Director of Crescendo Partners since December of 2005. Defendants, in their Proxies, have indicated that they will seek the election of defendant Ajdler to the board of directors of Charming Shoppes.

89.     Section 8 prohibits overlapping representatives on the boards of competitors with combined capital, surplus and undivided profits in excess of $25.3 million and competing sales of more than $2.53 million, Charming Shoppes and, on information and belief, Mothers Work are engaged in commerce as competitors in the sale of women's apparel and maternity apparel throughout the United States. Charming Shoppes and, on information, Mothers Work each have capital, surplus and undivided profits in excess of the $25.3 million and competing sales in excess of $2.53 million.

90.     Because Defendants' agent (Ajdler) is a member of the board of Mothers Work -- a competitor of Charming Shoppes -- Defendants are precluded by Section 8 of the Clayton Act from nominating defendant Ajdler or *any other agent or deputy* to the board of Charming Shoppes.  Unless enjoined, Defendants will establish an anticompetitive, interlocking directorate in violation of the Clayton Act between the boards of Mothers Work and Charming Shoppes, causing irreparable harm to Charming Shoppes and to consumers.

**Defendants Must Be Prevented From Continuing Their Unlawful Scheme**

91.     Defendants have violated and are continuing to violate the federal securities and antitrust laws by failing to disclose their true intentions regarding the Company, their history of violating the federal securities law, and using materially false and misleading proxies to deceive shareholders into believing they are legitimate investors, and would-be directors, when in fact, the sole purpose of their proxy solicitation is to coerce Charming Shoppes into selling assets, borrowing money or expending precious resources to purchase Defendants' stock through a greenmail transaction or otherwise.

92.     Defendants should be enjoined from further violating the federal securities and antitrust laws, and, absent corrective disclosures, should be enjoined from soliciting proxies or voting any shares acquired prior to such corrective disclosures.

93.     Charming Shoppes also requests that the Court require Defendants and any and all persons acting in concert with them to liquidate in an orderly fashion all of their Charming Shoppes shares acquired as part of the unlawful scheme described herein.

## IRREPARABLE HARM

94.     Unless Defendants are enjoined from continuing their unlawful conduct, Charming Shoppes, its shareholders and the investing public will continue to suffer irreparable injury in that, among other things:

(a)     The Charming Shoppes shareholders and the investing public will continue to be denied material information to which they are entitled under the federal securities laws and which is essential to informed investment decision making with respect to purchasing, selling and voting Charming Shoppes shares;

(b)     The market for Charming Shoppes shares will continue to be misled and disrupted;

(c)     The Defendants will continue to threaten using the Charming Shoppes shares acquired and held in violation of the federal securities laws in attempting to cause changes in the operation, structure and board composition of Charming Shoppes;

(d)     The widespread uncertainty created by Defendants' conduct will continue to destabilize Charming Shoppes and its shareholders; and

(e)     Defendants will be permitted to unlawfully profit from their unlawful conduct.

## COUNT I

## VIOLATIONS OF SECTION 13(d) OF THE EXCHANGE ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER BY ALL DEFENDANTS

95.     Charming Shoppes incorporates by reference paragraphs 1 through 94.

96.     The primary purpose of Section 13(d) of the Exchange Act, and the rules and regulations promulgated by the SEC thereunder, is to alert companies,

- 34 -

shareholders and the investing public generally to large, rapid aggregations or accumulations of stock that might represent a potential change in corporate control and to compel complete, accurate and timely disclosure of information critical to shareholders in making informed investment decisions.

97.     To achieve this purpose, Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1), and Rule 13d-1 promulgated thereunder, require that any person acquiring beneficial ownership of five percent or more of any class of securities of any company registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, must file a Schedule 13D with the SEC and any national exchange on which the Company's shares are registered (in this case the NASDAQ Global Select Market) within ten days of crossing the five percent threshold.

98.     In the Schedule 13D, the filing persons must fully and truthfully disclose (among other things) their purposes, plans and intentions with respect to the acquisition of such shares (Item 4).

99.     Rule 12b-20, 17 C.F.R. § 240.12b-20, specifically requires that the reporting persons also disclose "such further material information" as is necessary to make the information required in the Schedule 13D not misleading in light of the circumstances in which the required statements are made.

100.     As hereinabove alleged, the Initial 13D filing and the Amended 13D filing filed by Defendants fail to make the full and fair disclosure required by the Exchange Act and the rules promulgated thereunder.

101.     Plaintiff has no adequate remedy at law.

## COUNT II

## <u>VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER BY ALL DEFENDANTS</u>

102.    Charming Shoppes repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

103.    Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder prohibit the misrepresentation or omission of material facts in "any proxy statement, form of proxy, notice of meeting or other communication, written or oral…with respect to the solicitation of a proxy." (Such written communications are hereinafter referred to as the "Proxies.")

104.    The Proxies constitute a solicitation within the meaning of Section 14(a) of the Exchange Act and Rule 14a-9.

105.    Defendants filed the Proxies pursuant to Section 14(a), and have employed the mails and/or means of instrumentalities of interstate commerce, including, but not limited to filings with the SEC.

106.    The Proxies, filed pursuant to Section 14(a), are materially misleading and in violation of the federal securities laws because Defendants have failed to disclose, *inter alia*, to the shareholders of Charming Shoppes: (i) their history of violating the federal securities proxy laws and rules and of abusing the proxy process to enrich themselves at the expense of the other shareholders of the small, vulnerable companies they target; (ii) their efforts to solicit Ramius and, upon information and belief, other undisclosed collaborators to participate in their scheme; (iii) that, because a wholly-owned subsidiary of Charming Shoppes is a national bank, Defendants' Proxies may violate the notice provisions of the Bank Control Act, effectively disenfranchising

any shareholder who gives them their proxy; and (iv) that their solicitation proposes to violate the Clayton Act.

107.    At the times that Defendants filed the Proxies, pursuant to Section 14(a), Defendants knew that statements therein were false and misleading or recklessly disregarded or were negligent in failing to investigate and discover that the statements were false and misleading.

108.    The Proxies violate Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 promulgated thereunder.

109.    As a result of Defendants' continuing violations of Section 14(a) and Rules 14a-3 and 14a-9, the Company, its shareholders and the investing public have been, are being and will continue to be materially misled unless this Court grants Charming Shoppes the necessary and appropriate relief.  Defendants' continued material misstatements and omissions are negatively impacting the ability of the Company's other shareholders to make fully informed decisions with respect to how to vote their Charming Shoppes shares.

110.    Charming Shoppes has no adequate remedy at law.

## COUNT III

### VIOLATIONS OF CLAYTON ACT SECTION 8 PROHIBITING INTERLOCKING DIRECTORATES BY ALL DEFENDANTS

111.    Charming Shoppes repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

112.    Defendants serve on the board of directors of Mothers Work and intend to serve on the board of directors of Charming Shoppes.  Crescendo Partners' Managing Director, agent and deputy Arnaud Ajdler serves on the board of directors of

Mothers Work, and defendant Ajdler intends to serve on the board of directors of Charming Shoppes.

113.    The combined capital, surplus, and undivided profit of each of Mothers Work and Charming Shoppes exceeds $25.3 million, and their competing sales exceed $2.53 million, the statutory thresholds as set by the Federal Trade Commission pursuant to Section 8 of the Clayton Act, 15 U.S.C. § 19.

114.    Both Mothers Work and Charming Shoppes are engaged in whole or in part in commerce.

115.    Mothers Work and Charming Shoppes are competitors in the retail sale of women's apparel throughout the United States and beyond.  The elimination of competition between Mothers Work and Charming Shoppes in the United States would constitute a violation of the antitrust laws.

116.    Defendants proposed interlocking directorates, through defendants Ajdler and Crescendo Partners, among others, on the boards of directors of Mothers Work and Charming Shoppes would violate Section 8 of the Clayton Act, 15 U.S.C. § 19.

117.    Unless enjoined, Defendants' interlocking directorates will eliminate competition between Mothers Work and Charming Shoppes and cause irreparable harm to Charming Shoppes and to consumers.

118.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant relief against Defendants as follows:

(B)     Preliminarily and permanently enjoining Defendants and all other persons acting in concert with or on behalf of Defendants, directly or indirectly, from making any additional false or misleading public statements and false and misleading public filings regarding Charming Shoppes, and from taking or attempting to take any further steps in furtherance of their unlawful conduct and scheme;

(C)     the Court adjudge and declare that Defendants, as a group and individually, have violated Sections 13(d) and 14(a) of the Exchange Act and the rules and regulations promulgated by the SEC thereunder and Section 8 of the Clayton Act;

(D)     the Court preliminarily and permanently enjoin Defendants, their servants, employees, agents and attorneys, and all persons acting for them or on their behalf or in concert or participation with them, from directly or indirectly: (i) violating Sections 13(d) and 14(a) of the Exchange Act and the rules and regulations promulgated thereunder and Section 8 of the Clayton Act; and (ii) engaging in any further activities with respect to their shares until they have made adequate corrective disclosures as required by the Exchange Act;

(E)     Ordering Defendants to make immediate corrective disclosure of all material facts and to cure the material misstatements and omissions in the Initial and Amended Schedule 13D as well as in the Proxies;

(F)     Ordering Defendants to divest themselves of any and all shares of Charming Shoppes stock that they unlawfully acquired in violation of the federal

securities laws in accordance with and pursuant to a plan of divestiture ordered by the Court;

       (G)     Awarding Charming Shoppes reasonable attorneys' fees, costs and disbursements of this action;

       (H)     Ordering expedited discovery with respect to the claims alleged herein; and

       (I)     Awarding such other and further relief as this Court may deem just and proper.

Dated:  March 25, 2008

                    DRINKER BIDDLE & REATH LLP

                    Wilson M. Brown
                    Pa. Bar No. 25846
                    Riley H. Ross III
                    Pa. Bar No. 204676
                    One Logan Square
                    18th & Cherry Streets
                    Philadelphia, PA 19103-6996
                    212-988-2700
                    215-988-2757 (facsimile)

                    Attorneys for Plaintiff
                    Charming Shoppes Inc.

OF COUNSEL:

Gregory A. Markel
Martin L. Seidel
CADWALADER, WICKERSHAM
    & TAFT LLP
One World Financial Center
New York, NY  10281
(212) 504-6000
Attorneys for Plaintiff
Charming Shoppes Inc.